---------------------------------------------------------------- X
FLOYD EDWARD TEMPLE, JR., on behalf　　　　：　　　　　MEMORANDUM
of himself and all others similarly situated,　　　　：　　　　　AND ORDER
　　　　　　　　　　　　　　　　　　　　　　　：
　　　　　　　　　　　Plaintiff,　　　　　　　　：
　　　　　　　　　　　　　　　　　　　　　　　：
　　　　　　　　　　　　　　　　　　　　　　　：　　　　　06 CV 5303 (JG)
　　　　　- against -　　　　　　　　　　　　　：
　　　　　　　　　　　　　　　　　　　　　　　：
　　　　　　　　　　　　　　　　　　　　　　　：
CIRCUIT CITY STORES, INC.,　　　　　　　　　：
　　　　　　　　　　　　　　　　　　　　　　　：
　　　　　　　　　　　Defendant.　　　　　　　：
---------------------------------------------------------------- X
ROGER BENNETT AND RICHARD　　　　　　　　：
ALLEN COMBS, on behalf of themselves　　　　　：
and all others similarly situated,　　　　　　　　：
　　　　　　　　　　　　　　　　　　　　　　　：
　　　　　　　　　　　Plaintiffs,　　　　　　　：
　　　　　　　　　　　　　　　　　　　　　　　：
　　　　　　　　　　　　　　　　　　　　　　　：　　　　　06 CV 5304 (JG)
　　　　　- against -　　　　　　　　　　　　　：
　　　　　　　　　　　　　　　　　　　　　　　：
　　　　　　　　　　　　　　　　　　　　　　　：
WAL-MART STORES, INC.,　　　　　　　　　　：
　　　　　　　　　　　　　　　　　　　　　　　：
　　　　　　　　　　　Defendant.　　　　　　　：
---------------------------------------------------------------- X

A P P E A R A N C E S :

　　　　HARWOOD FEFFER LLP
　　　　　　　488 Madison Avenue, 7th Floor
　　　　　　　New York, NY 10022

　　　　　　　-- and --

　　　　BALL & SCOTT
　　　　　　　550 West Main Street, Suite 601
　　　　　　　Knoxville, TN 37902

　　　　By:　Gordon Ball
　　　　　　　Attorneys for Plaintiffs

　　　　JONES DAY

|   | 222 East 41st Street |
|---|---|
|   | New York, NY 10017 |
| By: | Meir Feder |
|   | Attorneys for Defendant Wal-Mart Stores, Inc. |

McGUIREWOODS LLP
    901 East Cary Street
    Richmond, VA 23219
By:   Howard Feller
    Attorneys for Defendant Circuit City Stores, Inc.

JOHN GLEESON, United States District Judge:

        These two cases derive from a settlement I approved in an antitrust class action against Visa U.S.A. Inc. ("Visa") and MasterCard International Inc. ("MasterCard"). *See In re Visa Check/MasterMoney Antitrust Litig.* ("*Visa/MasterCard III*"), 297 F. Supp. 2d 503 (E.D.N.Y. 2003), *aff'd*, 396 F.3d 96 (2d Cir. 2005) (approving settlement), *cert. denied*, 544 U.S. 1044 (2005). The defendants here -- Circuit City Stores, Inc. ("Circuit City") and Wal-Mart Stores Inc. ("Wal-Mart") -- were members of the plaintiff class in that action and participants in the settlement. Circuit City, Wal-Mart, and many other named plaintiffs claimed on behalf of millions of merchants in the class that Visa and MasterCard had violated the Sherman Antitrust Act, 15 U.S.C. § 1 *et seq.*, by "us[ing] their considerable market power in the credit card market to force [the merchant-plaintiffs], through 'Honor All Cards' policies, to accept Visa and MasterCard debit cards as well." *In re Visa Check/MasterMoney Antitrust Litigation* ("*Visa/MasterCard IV*"), No. 96 CV 5238(JG), 2005 WL 2100930, at *1 (E.D.N.Y. Aug. 31, 2005). In agreeing to settle those claims, Visa and MasterCard promised the merchant-plaintiffs, among other things, that they would rescind their Honor All Cards policies and pay $3.05 billion in damages over a ten-year period. *Visa/MasterCard III*, 297 F. Supp. 2d at 508.

        After I approved the *Visa/MasterCard* settlement, consumers who had purchased goods and services from the merchant-plaintiffs began to file their own antitrust actions against

Visa and MasterCard.[1] Some of these post-settlement actions also included *Visa/MasterCard* merchant-plaintiffs as defendants. *See Visa/MasterCard IV*, 2005 WL 2100930, at *1-*2 (denying motion to enjoin Ohio indirect purchaser action against Visa, MasterCard, and Ohio merchants).

These two putative class actions, by contrast, name as defendants *Visa/MasterCard* merchant-plaintiffs but *not* Visa or MasterCard. The plaintiffs in these cases are Tennessee consumers who purchased goods from Circuit City and Wal-Mart in Tennessee. The plaintiffs claim those merchants passed on to them additional costs they incurred due to the unlawful tying practices of Visa and MasterCard. At issue are two virtually identical complaints[2] (differing only in the names and description of the parties) alleging violations of (1) § 1 of the Sherman Act, 15 U.S.C. § 1,[3] pursuant to § 4 of the Clayton Act, 15 U.S.C. § 15;[4] (2) the antitrust statutes of Tennessee and 23 other states; (3) the consumer-protection statutes of 20

---

[1] According to the parties at oral argument, 20 courts in 16 jurisdictions had dismissed such actions, including a Tennessee action brought by the plaintiffs in the cases at issue here. *See Bennett v. Visa U.S.A. Inc.*, 198 S.W.3d 747, 749 (Tenn. Ct. App. 2006).

[2] The actions originated in the United States District Court for the Eastern District of Tennessee. Following the defendants' motions to dismiss and the filing of the plaintiffs' amended complaints, that court granted the defendants' motion to transfer to this district. The operative complaints are both entitled "Second Amended Class Action Complaint."

[3] That statute provides in relevant part that "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal." 15 U.S.C. § 1.

[4] That provision establishes a private cause of action for violation of the antitrust laws, in relevant part as follows:

> [A]ny person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor in any district court of the United States in the district in which the defendant resides or is found or has an agent, without respect to the amount in controversy, and shall recover threefold the damages by him sustained, and the cost of suit, including a reasonable attorney's fee.

15 U.S.C. § 15(a).

states (not including Tennessee); and (4) the unjust enrichment and civil conspiracy laws of Tennessee and 23 other states. Circuit City and Wal-Mart have moved pursuant to Fed. R. Civ. P. 12(b)(6) to dismiss the complaints for failure to state a claim upon which relief can be granted. The parties filed consolidated briefs on the motions, and I heard oral argument on July 11, 2007. For the reasons set forth below, the motion is granted and the complaints are dismissed without prejudice to a timely amendment.

BACKGROUND

The plaintiffs allege that the defendants illegally imposed "an extra 'sales tax'" on "every retail transaction between [the defendants] and [their] customers in the United States." Compl. ¶ 1. According to the complaints, the "tax" was initially imposed upon the defendants by Visa and MasterCard, who (and here the complaints refer to the defendants' own allegations as plaintiffs in *Visa/MasterCard*) "used their considerable market power in the credit card market to force [the defendants], through 'Honor All Cards' policies, to accept Visa and MasterCard debit cards as well." *Id.* ¶ 2. The "alleged illegal tying" of debit cards to credit cards "required [the defendants] to pay excessive interchange rates (*i.e.*, transaction costs) for the debit card purchases they were compelled to accept." *Id.*

The plaintiffs allege that the defendants paid the Visa and MasterCard interchange fees "for business reasons." *Id.* ¶ 3. That is, the defendants sought to "protect [their] own profits" by choosing to pay the fees rather than forego accepting Visa and MasterCard credit cards. *Id.* ¶ 5. According to the plaintiffs, the defendants then "systematically" passed the cost of those fees on to their retail customers by overcharging them for goods and services, *id.* ¶ 3; *see also id.* ¶ 6, which constitutes the alleged "sales tax."

4

Ultimately, the plaintiffs claim, each defendant conspired with Visa, MasterCard, and the numerous financial institutions that are members of Visa and MasterCard, *see id.* ¶¶ 13-17, through "an agreement, understanding, and concerted action," *id.* ¶ 46, to set their retail prices high enough to pass on the costs of the interchange fees to their customers. *See also id.* ¶ 7 ("[The defendants] knowingly agreed to and acceded to contractual relationships and tying arrangements with Visa and MasterCard that violated federal (and state) antitrust laws and passed the resulting costs [they] incurred . . . on to the Plaintiffs and other retail customers."). The conspiracy allegedly included "discussing, forming and implementing agreements to raise and maintain at artificially-high levels the prices for consumer goods and/or services." *Id.* ¶ 47.

DISCUSSION

A.  *The Standard of Review of a Motion To Dismiss*

A motion to dismiss pursuant to Rule 12(b)(6) tests the legal, not the factual, sufficiency of a complaint. *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974) ("When a federal court reviews the sufficiency of a complaint, before the reception of any evidence either by affidavit or admissions, its task is necessarily a limited one. The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims."); *Sims v. Artuz*, 230 F.3d 14, 20 (2d Cir. 2000) ("At the Rule 12(b)(6) stage, '[t]he issue is not whether a plaintiff is likely to prevail ultimately, but whether the claimant is entitled to offer evidence to support the claims.'" (quoting *Chance v. Armstrong*, 143 F.3d 698, 701 (2d Cir. 1998)) (prior citations omitted)). Accordingly, I must accept the factual allegations in the complaints as true, and draw all reasonable inferences in the plaintiffs' favor. *See Sheppard v. Beerman*, 18 F.3d 147, 150 (2d Cir. 1994), *cert. denied*, 513 U.S. 816 (1994).

The Supreme Court has recently generated some confusion about the standard governing the legal sufficiency of a complaint. In *Bell Atlantic Corp. v. Twombly*, 127 S. Ct. 1955, 1968-69 (2007), the Court abandoned the longstanding rule of *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957), "that a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." The Court held in *Twombly* that an allegation of facts that could equally support findings of either parallel or concerted action is legally insufficient to state a claim under § 1 of the Sherman Act. Rather, such a complaint must include "allegations plausibly suggesting (not merely consistent with) agreement." 127 S. Ct. at 1966. At the same time, the Court in *Twombly* explicitly refused to adopt a blanket requirement of "heightened fact pleading of specifics" in § 1 cases, *id.* at 1974, and the even more recent decision in *Erickson v. Pardus*, 127 S. Ct. 2197, 2200 (2007) (per curiam), reaffirmed that the notice pleading standard still determines legal sufficiency as a general matter. The Second Circuit has tried to reconcile "[t]hese conflicting signals" by the Court, holding that *Twombly* "is not requiring a universal standard of heightened fact pleading, but is instead requiring a flexible 'plausibility standard,' which obliges a pleader to amplify a claim with some factual allegations in those contexts where such amplification is needed to render the claim *plausible*." *Iqbal v. Hasty*, 490 F.3d 143, 157-58 (2d Cir. 2007) (Newman, J.).

In deciding the defendants' motion, I may consider documents attached to the complaint as exhibits, or statements incorporated by reference. *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152-53 (2d Cir. 2002).

B.     *The Sherman Act Claim*

The defendants move for dismissal of the plaintiffs' Sherman Act § 1 claim on the ground that the complaint's allegations, if true, do not establish that the plaintiffs suffered an injury that warrants recovery under § 4 of the Clayton Act. Principally, the defendants argue that the indirect purchaser rule bars the § 4 claim. I grant the motion because the plaintiffs' alleged antitrust injury is legally insufficient even if I construe the complaint to avoid application of the indirect purchaser rule.

Ordinarily, only a direct purchaser can bring a § 4 action against a seller for wrongful overcharge. This was the rule established by *Illinois Brick Co. v. Illinois*, 431 U.S. 720 (1977). In *Illinois Brick*, the Supreme Court held that certain purchasers of concrete blocks could not sue the manufacturers of the blocks for price-fixing when, even though the purchasers bore a passed-on amount of the manufacturer's overcharge, they were not the first, *i.e.*, the "direct," purchasers of blocks in the chain of sales. 431 U.S. at 736. After *Illinois Brick*, plaintiffs generally cannot recover under § 4 if their claimed injury[5] results from an overcharge first imposed upon and then passed on by an intervening upstream purchaser -- there is a strong, if not conclusive,[6] presumption against § 4 recovery for plaintiffs who "are not the immediate buyers from the alleged antitrust violators," even in cases in which immediate buyers "pass on 100 percent of their costs to their customers," because allowing any downstream recipients of a passed-on overcharge to sue would almost always create "difficulties of [damages] apportionment, the risk of multiple recovery, and the diminution of incentives for private

---

[5] The Supreme Court took pains in *Illinois Brick* to designate the indirect purchaser question as one of antitrust injury, distinguishing "analytically" the question of standing. *See* 431 U.S. at 728 n.7.

[6] The Court has indicated since *Hanover Shoe, Inc. v. United Shoe Machinery Corp.*, 392 U.S. 481, 494 (1968), that it might create an exception to the indirect purchaser rule for certain cost-plus contracts, but has never ruled on the issue. *See Kansas v. Utilicorp United, Inc.*, 497 U.S. 199, 217-18 (1990).

7

antitrust enforcement." *Kansas v. Utilicorp United, Inc.*, 497 U.S. 199, 207-08 (1990).

The Second Circuit recently applied the indirect purchaser rule in *Paycom Billing Services, Inc. v. MasterCard International, Inc.*, 467 F.3d 283 (2d Cir. 2006). In *Paycom*, the court of appeals affirmed the district court's dismissal of a Sherman Act § 1 claim against MasterCard by a merchant that processed payments for website operators, because, among other reasons, certain of the merchant's allegations could not establish antitrust injury.[7] 467 F.3d at 285. The merchant argued that MasterCard's "chargeback" policy violated § 1. According to the merchant, when a MasterCard cardholder disputes a transaction with a merchant, and the merchant has not seen the cardholder's payment card (*e.g.*, in an Internet transaction), the chargeback policy requires the issuing bank (the bank that issued the card) to be reimbursed by the relevant acquiring bank (the bank through which the merchant is paid). The acquiring bank, in turn, "usually" requires reimbursement by the merchant, who lacks any guarantee of payment by MasterCard. By contrast, in situations in which the merchant has seen the payment card, MasterCard guarantees repayment. *Id.* at 286-87. The plaintiff also argued that MasterCard violated § 1 by imposing supracompetitive chargeback penalties on acquiring banks, which "often" passed the overcharge on to the merchants. *Id.* at 288. The court of appeals rejected these arguments. It explained that because "the chargebacks and chargeback fines and penalties are imposed by issuing banks and MasterCard on acquiring banks," which themselves decide whether to pass on those cost of those disbursements to the merchants who handle the disputed transactions, the merchants are "indirect payor[s] of the chargeback and chargeback fines and penalties," and are therefore barred from suing MasterCard by the indirect purchaser rule. *Id.* at

---

[7] The court referred to the defect as a lack of "antitrust standing." 467 F.3d at 285.

291-92.

The rule operates with equal force in tying cases like this one. The dealer who purchases illegally tied goods or services suffers a direct antitrust injury, but the consumer who transacts with that dealer does not, because the consumer's damages flow from the dealer's pass-on of an overcharge. *See Link v. Mercedes-Benz of N. Am., Inc.*, 788 F.2d 918, 929-30 (3d Cir. 1986) (claim against Mercedes by consumers who bought auto parts from franchise dealers was barred by *Illinois Brick* when plaintiffs tried to show that "Mercedes required [the] dealers to purchase parts exclusively from Mercedes as a prerequisite to franchising . . . result[ing] in higher prices of parts to the retail class"); 2 Phillip E. Areeda, Herbert Hovenkamp, & Roger D. Blair, *Antitrust Law* ¶ 346h, at 370 (2d ed. 2000) (explaining that indirect purchaser rule can apply to tying claims). Application of the rule to the plaintiffs' tying claims is elementary: The plaintiffs allege they bought goods from Wal-Mart and Circuit City, dealers who were themselves supposedly overcharged for tied payment card services. Because the plaintiffs' claimed injury flows entirely from the overcharge first imposed upon and then passed down the stream of commerce by Wal-Mart and Circuit City, the plaintiffs are indirect purchasers for *Illinois Brick* purposes. They are therefore barred from bringing this § 1 tying action against Visa or MasterCard.

This conclusion does not end the discussion because the plaintiffs have not sued Visa and MasterCard. They have sued Wal-Mart and Circuit City. They suggest this pleading technique extinguishes any indirect purchaser problem because, with respect to Wal-Mart and Circuit City, the plaintiffs' injury was "direct." *See* Pl. Br. 21 ("Plaintiffs . . . are more accurately labeled as direct purchasers, who purchased goods and/or services from the

9

Defendants."). This argument is right -- when one party to a sale sues the other, the indirect purchaser rule does not apply because there is no intervening transaction -- but it does the plaintiffs no good. If Wal-Mart and Circuit City are going to be the only defendants, then I must dismiss the complaint because it does not allege that the defendants did anything wrong (at least as far as the Sherman Act is concerned). The complaint states that Wal-Mart and Circuit City simply "knew that the interchange fees being charged by Visa and MasterCard were illegal and that Visa and MasterCard were engaged in an illegal tying arrangement," and then "chose, for business reasons," to pay those fees in exchange for the tied products and to "systematically over-price[] [their] goods and/or services" to recoup the loss. Compl. ¶ 3. If the defendants each performed an independent "business" calculation to pass on the Visa/MasterCard overcharge to their customers, that is no § 1 violation because the conduct involved no "contract, combination . . . , or conspiracy." 15 U.S.C. § 1; *see also Geneva Pharm. Tech. Corp. v. Barr Labs. Inc.*, 386 F.3d 485, 506 (2d Cir. 2004) ("As [its] language states, § 1 targets concerted action between two or more entities. Independent conduct falls outside the purview of this provision." (citing *Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 761 (1984))); *United States v. Colgate & Co.*, 250 U.S. 300, 307 (1919) (section 1 applies only to concerted action).[8]

Dismissal is the right result here, given the Supreme Court's concern with avoiding, in private federal antitrust cases, complicated problems of tracing and apportionment of damages. *See Utilicorp United*, 497 U.S. at 209. When an antitrust violator and a plaintiff are separated by more than one transaction, the possible causes of economic loss in each transaction multiply, presenting a challenge for the plaintiff looking to trace her injury to the antitrust

---

[8] The plaintiffs do not claim Wal-Mart and Circuit City conspired with each other to restrain trade.

violation. *See Mid-Atl. Toyota Antitrust Litig.*, 516 F. Supp. 1287, 1292-93 (D. Md. 1981) ("[T]racing problems exist due to difficulties in attributing price increases, or any discrete portion thereof, to the illegal overcharge as opposed to the interaction of supply and demand or other pricing factors . . . ."). As several state courts have explained in addressing indirect purchaser claims against Visa and MasterCard, a "but for" model of damages must grapple with the complex non-cartel market forces that influence consumer transactions involving large retailers like Wal-Mart and Circuit City, not to mention the possibility that those retailers absorbed some nontrivial portion of the Visa/MasterCard overcharge. *See, e.g.*, *Gutzwiller v. Visa U.S.A., Inc.*, No. C4-04-58, 2004 WL 2114991, at *9 (Minn. Dist. Ct. Sept. 15, 2004), *abrogated on other grounds by Lorix v. Crompton Corp.*, 736 N.W.2d 619, 632 (Minn. 2007). Tracing such damages and apportioning them to each plaintiff will be difficult. *See also* Areeda et al. ¶ 395a, at 555-58 (explaining "practical problems of measurement" of indirect purchaser damages). It is far easier to assess damages in direct purchaser cases, which is one reason why direct purchasers are more efficient § 4 plaintiffs than indirect purchasers. The *Visa/MasterCard* case illustrates that efficiency, as Wal-Mart and Circuit City have already "vindicate[d] the public interest in antitrust enforcement" by bringing an action against Visa and MasterCard themselves. *Associated Gen. Contractors, Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519, 542 (1983).

The defendants argue that the difficulties of measuring the plaintiffs' damages will be so acute that any such assessment would be speculative. They make their point as part of a larger argument for dismissal on the ground that the plaintiffs lack antitrust standing. *See id.* at 540-45 (setting forth factors relevant to antitrust standing, including whether alleged injury is

speculative); *Daniel v. Am. Bd. of Emergency Med.*, 428 F.3d 408, 443 (2d Cir. 2005) (same). I decline to dismiss the complaint on antitrust standing grounds, however, for two reasons. First, while the defendants are correct that proof of damages in this case will be difficult, they have not convinced me that any evidence of damages will be insufficient as a matter of law. After all, antitrust plaintiffs need not prove damages with exactitude at any stage, much less in the pleadings. "[I]t will be enough if the evidence show the extent of the damages as a matter of just and reasonable inference." *Story Parchment Co. v. Paterson Parchment Paper Co.*, 282 U.S. 555, 563 (1931); *see also New York v. Julius Nasso Concrete Corp.*, 202 F.3d 82, 89 (2d Cir. 2000) (holding that antitrust plaintiff "need only provide the court with some relevant data from which the [factfinder] can make a reasonable estimated calculation of the harm suffered. In this way, the finder of fact can make a just and reasonable inference of damages based on the proof available" (internal quotation marks omitted)). The defendants have not demonstrated that *no* just and reasonable inference of damages is possible in this case. Second, I have no need to address the question whether the plaintiffs' injury is speculative, because I have already concluded dismissal is warranted on the ground that the plaintiffs have not established that they suffered an antitrust injury in the first place. *See Balaklaw v. Lovell*, 14 F.3d 793, 797 n.9 (2d Cir. 1994) ("[C]ourts must [first] determine whether the plaintiff suffered an antitrust injury," and [i]f the answer to that question is yes, they must then determine whether any of the other factors [of the antitrust standing inquiry], largely relating to the directness and identifiability of the plaintiff's injury, prevent the plaintiff from being an efficient enforcer of the antitrust laws.").

The plaintiffs would have me deny the motion to dismiss, despite established

policy against devoting judicial resources to determining the antitrust injury of indirect purchasers, because "[w]ithout the actions at bar, [they] -- the only truly innocent victims in the entire retail chain -- are left without a remedy." Pl. Br. 5. This point has force. Notwithstanding the daunting damages issues alluded to above, it seems clear to me that consumers like Temple and Bennett, not merchants like Wal-Mart and Circuit City, were likely the principal victims of the challenged tying arrangements. *See Visa/MasterCard III*, 297 F. Supp. 2d at 511. If the plaintiffs' allegations are true, viewing this case in combination with the settlement of the merchants' class action suggests that the indirect sellers may have been overcompensated while the indirect purchasers have been left in the red (at least with respect to their federal claims). But the Supreme Court has already balanced the possibility of perfect compensation with the need for administrative efficiency, and concluded that it is better to sacrifice the former for the latter. *See Illinois Brick*, 431 U.S. at 737 ("However appealing this attempt to [thoroughly] allocate the overcharge might seem in theory, it would add whole new dimensions of complexity to treble-damages suits and seriously undermine their effectiveness."); *see also Carter v. Berger*, 777 F.2d 1173, 1176-77 (7th Cir. 1985) (explaining how indirect purchaser rule also increases deterrence and avoids multiple recoveries).

    The plaintiffs also seek to avoid dismissal by alleging a "combination and conspiracy" among the defendants, Visa, and MasterCard, involving "an agreement, understanding, and concerted action, the objective of which was to raise and maintain at artificially-high levels the prices of consumer goods and/or services." Compl. ¶ 46. Courts have recognized that a vertical conspiracy between direct purchaser and direct seller can make the indirect purchaser's injury cognizable for *Illinois Brick* purposes. *See In re Nifedipine Antitrust*

13

*Litig.*, 335 F. Supp. 2d 6, 14-15 (D.D.C. 2004) (collecting cases).[9] This is in part because a vertical conspiracy can strip the *Illinois Brick* complexity out of calculating an indirect purchaser's damages. If the indirect purchaser paid an anticompetitive price due to a conspiracy that included the indirect seller, then the calculation of damages requires no tracing or apportionment, as a pass-on calculation would. The illegal agreement between the conspirators is said to eliminate the possibility that independent market forces caused the anticompetitive price increase. *See Mid-Atlantic Toyota*, 516 F. Supp. at 1295-96; Areeda et al. ¶ 346h, at 369-70. The plaintiffs argue that such a conspiracy obtains in this case, so their federal claim should not be barred by *Illinois Brick*.

I need not determine whether allegations of a vertical conspiracy eliminate *Illinois Brick* problems, whether as a general matter[10] or in tying cases particularly,[11] because in light of the Supreme Court's recent decision in *Twombly* the plaintiffs' allegations of a vertical conspiracy are insufficient to state a claim upon which relief can be granted.

As discussed above, the Court held in *Twombly* that a § 1 allegation of concerted action was legally insufficient when it alleged mere "parallel conduct unfavorable to competition" without "some factual context suggesting agreement, as distinct from identical,

---

[9] The Second Circuit does not appear to have addressed this question, although some district courts in the circuit have recognized that the indirect purchaser rule would not apply in such a case. *See, e,g.*, *Leider v. Ralfe*, No. 01 Civ. 3137(HB), 2003 WL 22339305, at *4 (S.D.N.Y. Oct. 10, 2003); *Gross v. New Balance Athletic Shoe, Inc.*, 955 F. Supp. 242, 247 (S.D.N.Y. 1997); *New York v. Dairylea Coop. Inc.*, 570 F. Supp. 1213, 1215-16 (S.D.N.Y. 1983).

[10] If there were a vertical conspiracy alleged in this case, the general rule requires dismissal of a complaint that fails to join the other members of the conspiracy as co-defendants. *See Link*, 788 F.2d at 931-33; *In re Beef Indus. Antitrust Litig.*, 600 F.2d 1148, 1163 (5th Cir. 1979), *cert. denied*, 449 U.S. 905 (1980).

[11] The defendants argue that "[t]he co-conspirator exception . . . cannot apply to a tying claim for an obvious reason: the indirect purchaser would have to prove that the direct-purchasing victim 'passed on' the overcharge on the tied product, yet such a 'pass on' theory is barred by *Illinois Brick*." Def. Br. 9.

independent action." 127 S. Ct. at 1961. The *Twombly* complaint had claimed that certain telecommunications providers conspired to artificially inflate the price of local telephone and high-speed Internet services, thereby raising the entry costs of competitor local exchange carriers. According to the complaint, the defendants engaged in unfair parallel conduct that adversely affected the local exchange carriers, and made agreements with each other not to compete. *See id.* at 1962-63. The Court found these allegations insufficient, holding that "an allegation of parallel conduct and a bare allegation of conspiracy" does not state a § 1 claim. *Id.* at 1966. Rather, the Court required "allegations plausibly suggesting (not merely consistent with) agreement." *Id.* Under *Twombly*, then, an allegation of facts that can equally support a possible finding of parallel or concerted conduct is legally insufficient to state a claim under § 1.

As in *Twombly*, the complaints here allege conduct by the defendants on one hand, and by Visa and MasterCard on the other, that is equally explained by independent decision as by a vertical conspiracy. The plaintiffs claim that the defendants elected to pay the interchange fees imposed by Visa and MasterCard to "protect [their] own profits." Compl. ¶ 5; *see also id.* ¶ 3 ("for business reasons"). According to the complaints, the defendants then overcharged their customers "[t]o make up for paying these excessive transaction fees." *Id.* By itself, such passing-on could be due to an independent economic decision by the defendants, as the complaint appears to recognize. *See id.* ¶ 6 ("[Defendants'] economic expert in the merchants' action stated that '[t]he interchange fee increases the merchants' effective selling costs by acting as a tax on debit card transactions. As a result, the merchant *must raise* overall prices on their goods and services in order to recover the higher costs." (emphasis added)). Or the passing-on could conceivably be due to a vertical conspiracy between the defendants and

15

Visa and MasterCard. But *Twombly* requires that the plaintiffs allege facts that push the claim of conspiracy over "the line between possibility and plausibility of entitlement to relief." *Twombly*, 127 S. Ct. at 1966 (internal quotation marks and alterations omitted). The plaintiffs allege the defendants "entered into an illegal arrangement, contract, agreement, trust, or combination with" Visa and MasterCard, Compl. ¶ 1, "participated in a conspiracy" with Visa and MasterCard, *id.* ¶ 4, "engaged in a continuing combination and conspiracy" with Visa and MasterCard, *id.* ¶ 45, and so on. But the complaints mention no facts to support the claim that such an agreement or conspiracy existed, and the "naked assertion of conspiracy," however often repeated, does not do the trick. *Twombly*, 127 S. Ct. at 1966. Because the complaints, when construed to allege a vertical conspiracy including Visa and MasterCard to avoid application of the indirect purchaser rule, still lack the requisite "amplification" of allegations of such a conspiracy, I must grant the motions to dismiss the federal antitrust claim. *Iqbal*, 490 F.2d at 158.[12]

---

[12] The foregoing discussion arguably gives the plaintiffs' theory more credit than it deserves. At oral argument, plaintiffs' counsel contended that Wal-Mart and Circuit City committed an antitrust violation not by agreeing with Visa and MasterCard, but merely by passing along the costs of those companies' antitrust violations:

[Plaintiffs' Counsel]: I think that's what *Perma-Life* -- if we prove to the jury, the factfinder, and not at that stage, but if we prove that Wal-Mart and Circuit City acquiesced for business purposes, and they knew that the tying arrangement was illegal and they acquiesced for their own business purposes and participated in [the] illegality of the tying arrangement by passing it along.

The Court: By passing it along?

[Plaintiffs' Counsel]: By passing it along that makes them culpable.

The Court: Did *Illinois Brick* just disappear with that argument?

[Plaintiffs' Counsel]: I think so.

July 11, 2007 Tr. at 37. As further refined, the plaintiffs' theory at oral argument was that *Illinois Brick* only precludes indirect purchaser actions where the direct purchaser is *unaware* of the fact that it is passing along the costs of an antitrust violation. But once the direct purchaser *knows* of the violation, it goes "from being a, quote, victim," to an antitrust violator if it also passes along the cost. *Id.* at 40. According to plaintiffs' counsel, the dispositive factual question is whether the direct purchaser "participate[s] in illegality" by being aware of the

16

C.    *The Non-Tennessee State Law Claims*

The defendants move to dismiss the claims arising under the laws of states other than Tennessee, arguing that the plaintiffs lack standing to bring them. I agree. The complaints allege that the plaintiffs are citizens and residents of Tennessee, who used debit cards "to purchase goods and/or services [from the defendants] in . . . Tennessee" at prices that "were inflated due to [the defendants'] illegal conduct." Compl. ¶ 12. Nowhere do the plaintiffs allege they were harmed within any other state's jurisdiction.

The plaintiffs must present a justiciable "Case[]" or "Controvers[y]" to invoke the jurisdiction of this Court. U.S. Const. art. III, § 2, cl. 1. They present no such case or controversy if they lack standing to sue, *i.e.*, if they allege no (a) injury-in-fact that is (b) fairly traceable to the defendants' allegedly unlawful conduct and (c) likely to be redressed by a favorable decision. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992); *Alliance for Envtl. Renewal, Inc. v. Pyramid Crossgates Co.*, 436 F.3d 82, 85 (2d Cir. 2006). Here, the plaintiffs allege no injury within any state other than Tennessee. Such injuries, if they occurred, were suffered by other people. The plaintiffs therefore have no standing to bring claims for injuries under the laws of the non-Tennessee states, and I therefore dismiss those claims for lack of subject matter jurisdiction.

The plaintiffs do not dispute that they lack standing to advance non-Tennessee state law claims on behalf of third parties. Rather, they argue that "it is inappropriate at this juncture in these proceedings to address Plaintiffs' standing with respect to other states' laws, as such a determination is more properly addressed during the class certification proceedings." Pl.

---

upstream violation and not absorbing the entire cost of it. *Id.* This of course is not the law.

Br. 35. I disagree. The Supreme Court has made clear that because Article III standing goes to a federal court's jurisdiction, the court should consider standing as a threshold issue. *See City of Los Angeles v. Lyons*, 461 U.S. 95, 101 (1983); *Warth v. Seldin*, 422 U.S. 490, 498 (1975).

The plaintiffs attempt to analogize their putative class action to the mass-tort global asbestos settlements at issue in *Amchem Products, Inc. v. Windsor*, 520 U.S. 591 (1997), and *Ortiz v. Fibreboard Corp.*, 527 U.S. 815 (1999), in which the Court held that the class certification issues presented by the settlements were "logically antecedent" to Article III standing considerations. The analogy fails. The class actions in *Amchem* and *Ortiz* were pre-negotiated global settlements filed for the sole purpose of settling a vast number claims of actual and potential harm; as I have explained elsewhere, "in both cases, the Supreme Court did not conduct a threshold analysis of the standing of so-called 'exposure only' claimants, perhaps because its ultimate rejection of the class certification made that analysis unnecessary -- there could be no further litigation (or settlement) without court approval of the class." *In re AIG Advisor Group Sec. Litig.*, No. 06 CV 1625(JG), 2007 WL 1213395, at *4-*6 (E.D.N.Y. Apr. 25, 2007) (explaining narrow application of *Amchem* and *Ortiz*). In this case, by contrast, the case can move forward on the plaintiffs' Tennessee claims, so a rejection of class certification would not be dispositive. Accordingly, I decline to postpone consideration of the plaintiffs' Article III standing.

D.    *The Tennessee State Law Claims*

The remaining claims in this action require application of Tennessee law. I conclude that the parties should have the opportunity to be heard with respect to whether this case should now be transferred back to the federal court in Tennessee, in deference to that

18

court's expertise in the applicable law.

CONCLUSION

For the reasons set forth above, the plaintiffs' Sherman Act claims are dismissed for failure to state a claim upon which relief can be granted, the plaintiffs' claims pursuant to laws of states other than Tennessee are dismissed for lack of standing, and the parties are directed to show cause by letter to the Court on or before October 5, 2007 why the case should not be transferred back to the court in which it was filed -- the United States District Court for the Eastern District of Tennessee.

So ordered.


John Gleeson, U.S.D.J.

Dated:  Brooklyn, New York
        September 25, 2007